IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Walker D. Miller

Civil Action No. 08-cv-00641-WDM-BNB

ROGER P. MAY,

      Plaintiff,

v.

J.P. TURNER & COMPANY, LLC, a Georgia corporation,

      Defendant.

---

## ORDER ON MOTION TO DISMISS

---

Miller, J.

      This matter is before me on the Motion to Dismiss (doc no 6) filed by Defendant J.P.

Turner & Company, LLC ("J.P. Turner") and the Motion for Preliminary Injunction Staying

Arbitration (doc no 18) filed by Plaintiff Roger May ("May").  Plaintiff initiated this lawsuit in

order to obtain a declaration that he is not required to arbitrate claims asserted by J.P.

Turner in an on-going arbitration proceeding.  J.P. Turner seeks dismissal of the complaint

on the grounds that the underlying dispute clearly falls within the scope of one or both of

two arbitration clauses to which Plaintiff agreed.  I agree with J.P. Turner and will dismiss

Plaintiff's complaint.

<u>Background</u>

      Plaintiff's Verified Complaint for Declaratory Judgment ("Complaint") (doc no 1)

alleges that J.P. Turner is a broker-dealer registered with the Securities and Exchange

Commission and is a member of the Financial Industry Regulatory Authority ("FINRA")

[f/k/a National Association of Securities Dealers or "NASD"].  May was an employee and

registered representative for J.P. Turner from November 2003 until March 23, 2005.

One of J.P. Turner's customers during May's employment was a Denver-based company called Rentech, Inc. *Id.* at ¶ 11. J.P. Turner and Rentech entered into a contract whereby J.P. Turner raised $850,000 in debt for Rentech. *Id.* According to Plaintiff, the transaction closed on December 1, 2004. *Id.* Thereafter, Rentech used the services of Jefferies & Company, Inc. ("Jefferies"), another broker-dealer, to raise additional funds for Rentech to purchase a fertilizer plant in East Dubuque, Iowa. *Id.* at ¶ 12. May was aware of these efforts by Jefferies to raise money for Rentech and informed a friend of these efforts. *Id.* at ¶ 13. The friend in turn contacted a representative of Mercator Capital, a venture capital firm, to inform them of the deal and to see whether Mercator was interested in investing in Rentech. *Id.* at ¶ 14. May also contacted Jefferies about the possibility of investing in Rentech. *Id.* at ¶ 15. However, the effort by Jefferies to raise money for Rentech was ultimately unsuccessful and abandoned around March 2005. *Id.* at ¶ 15.

After May resigned from J.P. Turner, he formed his own consulting business. *Id.* at ¶ 16. His first customer was Rentech. *Id.* By April 2005, May put together a group of venture capital funds and individuals interested in investing in Rentech. *Id.* at ¶ 18. However, ultimately another investment group associated with Mercator made a competing proposal, which was accepted by Rentech. *Id.* at ¶¶ 19-20. May was paid a portion of a "break-up fee" and paid for his consulting services. *Id.* at ¶¶ 22-23. In the last few years, May has also advised other small capitalization companies against using the service of J.P. Turner. *Id.* at ¶ 27.

In October 2007, J.P. Turner filed a demand for arbitration with FINRA, alleging that J.P. Turner was entitled to compensation in connection with the April 2005 placement

between Mercator and Rentech.  *Id.* at ¶ 29.

According to J.P. Turner's Statement of Claim (Exh. A to Complaint), the 2004 transaction between Rentech and J.P. Turner was governed by a Financial Representative Agreement (the "Agreement"), under which J.P. Turner agreed to locate investors for public offerings of securities by Rentech.  Statement of Claim at 4.  After the 2004 transaction(s) closed, Rentech engaged Jefferies to raise approximately $40 million to finance a merger; Rentech requested that J.P. Turner be a part of the offering.  *Id.* at 5.  J.P. Turner requested a new agreement but was told by Rentech that the 2004 Agreement could cover upcoming offerings.  *Id.*  J.P. Turner continued to serve as Rentech's investment banker and to provide Rentech with potential investors.  *Id.*  Under the 2004 Agreement, if J.P. Turner introduces any investors to Rentech who thereafter invest in Rentech's offerings, J.P. Turner should receive a cash fee equal to 5% of the gross proceeds of the offering as well as a warrant to purchase a certain amount of Rentech's common shares.  *Id.*  Around February 6, 2005, May, on behalf of J.P. Turner, identified and disclosed to Rentech and Jefferies the identity of J.P. Turner's potential investor, specifically the Mercator Master Fund.  *Id.* at 6.  Mercator had previously invested in several other offerings through J.P. Turner.  *Id.*

Thereafter, Jefferies and J.P. Turner executed a "Master Selected Dealer Agreement" whereby Jefferies agreed that J.P. Turner would receive 50% of the compensation that Jefferies was to receive from the Rentech deal.  *Id.* at 7.  On March 15, 2005, while the proposed financing was pending, Rentech confirmed it would compensate J.P. Turner for any investment made by Mercator in Rentech.  *Id.* at 8.  In addition, Rentech represented to J.P. Turner that even if this deal did not close, Rentech would want J.P.

Turner to place a smaller financing with Rentech through J.P. Turner's investors. *Id.*

On March 23, 2005, the day that May resigned from J.P. Turner, Rentech announced that it was terminating its plans for the merger. *Id.* at 8. However, two weeks later, on April 8, 2005, Rentech entered into a financing agreement with J.P. Turner's investor, Mercator, in which Mercator invested $9 million in a Rentech offering. *Id.* J.P. Turner claims a cash fee and warrants from this transaction pursuant to the Agreement. *Id.* J.P. Turner alleges that the fee was instead paid to May, disguised as a consulting fee. Id. at 8-9. J.P. Turner also alleges that Rentech paid Jefferies for acting as the "placement agent" with Mercator; J.P. Turner claims, pursuant to the Master Selected Dealer Agreement, 50% of the fee paid by Rentech to Jefferies. *Id.* at 9. J.P. Turner named Rentech, Jefferies, and May as respondents in the FINRA arbitration.

In the motion to dismiss, J.P. Turner argues that either of two arbitration provisions in agreements signed by Plaintiff require that the underlying dispute be resolved in arbitration. The first is an arbitration provision contained in a "Registered Representative Agreement - Licensee Offices" (the "RR Agreement"), which J.P. Turner alleges was signed by Plaintiff when he began his employment. Memorandum in Support of Motion to Dismiss, Exh. A to Declaration of Scott Holcomb (doc no 7-3). Paragraph 16 of the RR Agreement provides that May and J.P. Turner agreed to arbitrate pursuant to the NASD and the NASD Code of Arbitration Procedure "any dispute between them, or any controversy or claim arising out of or relating to this Agreement." *Id.* at 6, ¶ 16. The second arbitration provision is contained in Plaintiff's Form U-4, which he signed in connection with his registration as an associated person of FINRA Member J.P. Turner. Memorandum in Support of Motion to Dismiss, Exh. B to Declaration of Scott Holcomb (doc no 7-3). The Form U-4 contains

the following:

> I agree to arbitrate any dispute, claim or controversy that may arise between me and my firm [J.P. Turner], or a customer, or any other person, that is required to be arbitrated under the rules, constitutions, or by-laws of the SROs [self-regulatory organizations] indicated in Section 4 (SRO REGISTRATION) as may be amended from time to time and that any arbitration award rendered against me may be entered as a judgment in a court of competent jurisdiction.

*Id.* at § 15A, ¶ 5. It appears to be undisputed that the SROs indicated in Section 4 of the Form U-4 includes the NASD, now FINRA. The FINRA Code requires arbitration "if the dispute arises out of the business activities of a member or an associated person and is between or among: Members; Members and Associated Persons; or Associated Persons." FINRA Code of Arbitration Procedure for Industry Disputes § 13200(a).

Plaintiff disputes that he executed the RR Agreement and claims that the signature is not his. He does not dispute that he signed the Form U-4, but contends that this matter does not fall within the scope of the arbitration provision.

## Standard of Review

Agreements to arbitrate are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 4. A motion to compel arbitration based on an arbitration agreement is governed by 9 U.S.C. § 4 which states:

> The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. . . . If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof."

9 U.S.C. § 4. "[Q]uestions of arbitrability must be addressed with a healthy regard for

the federal policy favoring arbitration and thus any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Williams v. Imhoff*, 203 F.3d 758, 764 (10th Cir. 2000) (citations and internal punctuation omitted).

To determine whether a claim falls within the scope of an arbitration clause, I first determine whether the parties agreed to arbitrate the claims at issue. *Williams*, 203 F.3d at 764. If I so determine, I next examine whether legal constraints external to the parties' agreement foreclose the arbitration of those claims. *Id.*

Even if I limit my examination of the issue to only the arbitration agreement contained in Plaintiff's Form U-4, I conclude that the underlying dispute falls within the scope of this provision. As discussed above, FINRA rules require arbitration if the dispute "arises out of the business activities of a member or an associated person" and is between or among FINRA members or a member and an associated person. J.P. Turner is a member of FINRA and May is an associated person[1]. Therefore, the only question is whether the dispute "arises out of" the business of J.P. Turner. The Tenth Circuit in *Williams* determined that this phrase must be "broadly construed to mean 'originating from,' 'growing out of,' or 'flowing from.'" 203 F.3d at 765.

Resolution of the underlying dispute will require, *inter alia*, a determination of: (1) whether Rentech had an agreement with J.P. Turner under which it was obligated to pay J.P. Turner a fee or commission as a result of any investment by Mercator in

---

[1]It is of no import that Plaintiff is no longer associated with J.P. Turner, as the FINRA rules contemplate that an associated person includes persons "formerly associated with a member" of FINRA. FINRA Rule 13100 (r). In addition, it appears that at least part of the underlying events occurred while Plaintiff was still employed with J.P. Turner.

Rentech; and (2) whether May assisted Rentech in avoiding that agreement, benefitting himself at the expense of J.P. Turner. It appears that the initial relationship between Rentech, J.P. Turner, and May all arose out of the business of J.P. Turner, as did the introduction of Mercator as a possible investor for Rentech. Plaintiff does not dispute that while still employed at J.P. Turner, he contacted an employee of Mercator about Rentech and forwarded his email address to Jefferies. Moreover, the crux of the dispute is the existence of an agreement allegedly entered into during the course of J.P. Turner's previous provision of investment services to Rentech, which involved May. Given the strong policy of resolving doubts in favor of arbitration and the Tenth Circuit's broad interpretation of the term "arising out of" in the context of the FINRA/NASD Code, I conclude that J.P. Turner's claim against May is subject to the arbitration provision in May's Form U-4 because it arises out of J.P. Turner's business.

I now turn to the second step of the analysis, which is to examine whether legal constraints external to the parties' agreement foreclose arbitration. Plaintiff contends that J.P. Turner has unclean hands and, therefore, I should exercise my equitable discretion and deny dismissal.

The unclean hands doctrine is applied when "some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks." *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245 (1933). "[W]hile equity does not demand that its suitors have led blameless lives as to other matters, it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814–15 (1945). The doctrine allows courts to exercise a wide range of

discretion as "[a]ny willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for the invocation" of the doctrine. *Id.* at 815.

The evidence in support of Plaintiff's unclean hands defense, however, is thin. First, Plaintiff contends that when J.P. Turner filed the FINRA arbitration, it did not reference the RR Agreement; J.P. Turner nonetheless criticized Plaintiff for not mentioning the RR Agreement when Plaintiff objected to the arbitration. Since the Form U-4 supports arbitration and Plaintiff has not identified any reason why J.P. Turner should have referenced the RR Agreement, I see no wrongful conduct.

Plaintiff next asserts that the RR Agreement proffered by J.P. Turner is "a highly suspect conglomeration of papers with glaring discrepancies." Plaintiff's Brief in Opposition to Motion to Dismiss (doc no 17) at 11. As noted above, Plaintiff disclaims this document, asserting that it does not contain his signature and that certain footnotes indicate that a signature page was simply appended to another document. I conclude that the parties' dispute about the genuineness of this document does not control my decision here because there is clearly a binding arbitration agreement.

Finally, Plaintiff argues that J.P. Turner's initiating arbitration is somehow wrongful and that J.P. Turner has used "vitriolic" language in its briefing. Plaintiff has shown no more than J.P. Turner's exercise of a contractual right and its counsel's employment of forceful advocacy. None of this amounts to an "unconscionable act"

sufficient to demonstrate that J.P. Turner should be barred by equity from proceeding with the arbitration.

Accordingly, it is ordered:

1. The Motion to Dismiss (doc no 6) filed by Defendant J.P. Turner & Company, LLC is granted. The underlying dispute between Plaintiff and J.P. Turner is subject to an agreement to arbitrate between Plaintiff and J.P. Turner. Accordingly, Plaintiff's complaint is dismissed.

2. The Motion for Preliminary Injunction Staying Arbitration (doc no 18) is denied.

DATED at Denver, Colorado, on October 6, 2008.

BY THE COURT:


*s/ Walker D. Miller*
United States District Judge
